The plaintiff, Harvey L. Pegram, appeals from a judgment entered on a directed verdict for the defendant, William J. Hebding, in this action to recover damages based on allegations of fraud and intentional interference with an employment contract. We affirm in part, reverse in part, and remand.
The evidence, viewed in a light most favorable to Pegram, seeFirst Financial Insurance Co. v. Tillery, 626 So.2d 1252 (Ala. 1993) (discussing the well-established standard for reviewing directed verdicts), indicates the following: In 1983, Pegram, Hebding, and another person left their management positions with another company to found Comptronix Corporation, a contract manufacturer of diversified electronics products and assemblies. Pegram, who was experienced in material management and procurement, assumed responsibility for the purchasing and receiving of materials at Comptronix. For over five years, Pegram sat on Comptronix's board of directors and served as executive vice president in charge of material management and procurement for the company. During that same time, Hebding, who had become Comptronix's chief executive officer and chairman of its board of directors, took care of the accounting and financial aspects of the business.
In April 1989, as preparations were being made for a public offering of Comptronix stock, the underwriters of the offering required Pegram and other high level management employees to sign employment contracts with the company. Pegram's contract provided, in pertinent part, that he would "serve as Executive Vice President of the Company or in any other comparable position as the Board of Directors may from time to time determine" and that he would "have such powers and duties as are customarily associated with such position." The contract also provided that Pegram's employment could be terminated for "Cause or for any other reason." Included within the contract's definition of "Cause" were "acts of dishonesty or fraud . . . harmful to the Company." Pegram's experience and position within the company were highlighted during Comptronix's campaign to impress investors.
Also in 1989, Pegram and Hebding began to develop personal and professional differences *Page 698 
regarding Comptronix. Pegram questioned Hebding's handling of certain stock transactions by Comptronix employees. Also about this same time, Pegram and Hebding discussed whether Comptronix should disclose certain information to investors in connection with the company's public stock offering, which was to occur in May 1989. Pegram had learned that one of the company's primary customers, Conners Peripherals, Inc. ("Conners"), was considering taking most of its business "overseas." Pegram expressed concern that this information might be material information that should be disclosed to potential investors under applicable securities laws. Hebding asked Pegram to get his contact person within Conners to reassure potential investors, as well as the underwriters of the stock offering, that it was not anticipating taking its business elsewhere. Pegram refused. Pegram did learn from his contact within Conners that Conners anticipated doing some business with Comptronix. Hebding eventually told Pegram that, in his opinion, the information was not material, and Comptronix did not mention in its offering documents the possibility of a substantial reduction in business with Conners. Comptronix did later issue a press release in August 1989, announcing "that it [had] received less than anticipated orders from another major customer for disk drive products." The customer referred to in the press release was Conners. Comptronix subsequently issued another press release in October 1989, stating in pertinent part:
 "Comptronix Corporation [previously] announced that it had received less than anticipated orders from a major customer for disc drive products. Today, the Company announced that it expects orders from this customer to decline even further. . . ."
The customer referred to in this press release was also Conners.
Shortly after the public stock offering, Hebding, over Pegram's objections and for a reason not apparent to Pegram, unilaterally transferred Pegram from his position as vice president in charge of material management and procurement to the position of vice president in charge of sales and marketing, an area in which Pegram had had far less experience. This transfer, which was accompanied by a raise in Pegram's salary, was not immediately approved by the company's board of directors. However, the board later passed a resolution confirming Pegram's new position. Although Hebding characterized Pegram's transfer as a "promotion," Pegram, in his previous position, had supervised approximately 44 employees; he supervised only one in his new position.
Agreeing to assume his new position under protest, Pegram sued Comptronix in August 1989, seeking a declaration of his rights under his employment contract. Pegram alleged that his new position was not comparable to his previous one with respect to his overall management responsibilities. Pegram also sought damages from Hebding for fraud and intentional interference with his employment contract. In connection with his fraud claim, Pegram alleged that Hebding had misrepresented at the time the company was formed in 1983 that the three founders would "hold positions of equal rank and salary" and that they would "make all major decisions on a consensual basis"; and, in connection with his claim alleging intentional interference with his employment contract, he alleged that Hebding had improperly used his position at Comptronix to demote Pegram.
After learning about Pegram's lawsuit, Hebding required Pegram to check in with him at the beginning of each week and to provide him with a detailed accounting of what he intended to do that week; to check in with Hebding's secretary during the week; and to report to Hebding at the end of the week and to provide a detailed accounting of what he had done that week. This "checking in" had not been a requirement of Pegram's previous position. Hebding also prohibited Pegram from contacting Conners, even though Pegram had worked with Conners for a number of years, and prohibited him from contacting any of the company's existing customers, and he told Pegram to spend his time on the road looking for new customers. Approximately three weeks after Pegram filed his complaint, Comptronix's board of directors placed him on administrative leave. *Page 699 
In a specially called meeting in late December 1989, the board of directors terminated Pegram's employment for "cause" after it was presented with a report from a Tennessee lawyer; that lawyer had been hired by Hebding to investigate a sale of stock by Pegram. He had concluded that there was sufficient evidence of illegal insider stock trading on Pegram's part to justify terminating his employment contract. Hebding presided over that meeting. The report was the culmination of an investigation that Hebding and Comptronix had initiated into a stock sale that Pegram had made in September 1989, after Pegram and others within the company had become aware that Conners might take most of its business elsewhere. The thrust of the investigation concerned whether Pegram had sold his stock without the public's being made aware of the probable future reduction in Conners's business. The underwriting agreement that had been executed in connection with Comptronix's public stock offering prohibited company insiders from selling any of their stock until 120 days after the offering. Following the expiration of the 120-day period, and after the company's August press release announcing a reduction in sales to a "major customer," Pegram sold some of his stock through his broker. Pegram had twice obtained approval for the sale from Comptronix's secretary and general counsel, as he was required to do by company policy. However, the Tennessee lawyer had not been made aware that Pegram had obtained the approval for the stock sale from the company's general counsel. The report that was submitted to the board specifically noted that Pegram had sold his stock shortly before the October 1989 press release and that Pegram had represented in a form filed with the Securities and Exchange Commission that he was not aware of any nonpublic material information that could adversely affect the value of the stock. Conspicuously absent from the report was any mention of the general counsel's approval of the sale; of the August 1989 press release (which was made before Pegram sold his stock); or of the fact that Hebding and others within the company had originally concluded that the Conners information was not material. Hebding had prohibited the lawyer from talking with Pegram. The lawyer spoke with only two persons within Comptronix before presenting his report to the board — Hebding and the company's general counsel — and he relied on information supplied primarily by Hebding.
Pegram was not informed before the board meeting that he was suspected of insider stock trading. Pegram was allowed to see the report that was submitted to the board; however, he was not permitted to retain a copy of it. Pegram was not allowed to be present when the board voted on his termination. Following the meeting, in which Hebding voted to discharge Pegram, Hebding had an armed security guard escort Pegram to his automobile, refusing at that time to allow him to collect his personal belongings. Pegram's ouster from the premises was done in such a way as to afford an opportunity to a number of Comptronix's employees to witness it. Pegram's personal belongings, Pegram says, were later "dumped" into several boxes and mailed to him.
On November 25, 1992, Comptronix issued a press release stating that Hebding and several others within the company, including the individual Hebding had hired to replace Pegram as vice president of material management and procurement, had engaged in a fraudulent scheme to intentionally overstate sales, fixed assets, and inventory through improper entries in Comptronix's accounting records. The purpose of the scheme, which resulted in Hebding's discharge, was apparently to inflate the value of Comptronix stock for Hebding's personal financial gain. Comptronix's records reflected that Hebding's fraudulent conduct generated over $5,000,000 in false entries in 1989. Shortly after this press release was issued, Pegram amended his complaint, to allege that Hebding had driven him from Comptronix in order to implement and perpetuate, without detection, Hebding's fraudulent accounting scheme. Pegram specifically alleged that he would have been in a position to discover Hebding's fraud if he had remained in charge of material management and procurement. Pegram also sought damages from Hebding based on allegations that Hebding had suppressed *Page 700 
information from the board concerning Hebding's involvement in the scheme to defraud Comptronix.
Comptronix and Pegram reached a pro tanto settlement of Pegram's breach of contract claim, filing a joint stipulation of dismissal that stated, in pertinent part:
 "This statement is intended to represent the common understanding of Comptronix Corporation, through its current management, and Harvey Pegram regarding the various matters discussed below.
 "1. Harvey Pegram was one of the persons who originally conceived the idea of founding Comptronix Corporation. He participated extensively in the preparation of the Company's initial business plan, provided some of the initial capital to start the Company and in general played a critical role in establishing the Company's business.
 "2. Harvey Pegram served as a senior officer of Comptronix Corporation for the first several years of its existence and in that role was instrumental in enabling the Company to establish supplier relationships, based on his longstanding relationships in the electronic component marketplace.
 "3. In the late 1980s, significant personal disagreements and disputes developed on a variety of matters between Harvey Pegram and the then CEO of Comptronix, William Hebding.
 "4. The Board of Directors of Comptronix Corporation, acting on information substantially all of which was provided by William Hebding, elected Harvey Pegram Executive Vice President of Marketing and Sales of the Company during 1989. In that position, he no longer had responsibility for the Company's procurement activities as had previously been the case.
 "5. In December 1989, the Board of Directors of Comptronix Corporation, again acting on information provided in part by William Hebding as well as on advice of counsel, voted to dismiss Harvey Pegram for cause as that term was defined in his employment agreement. Mr. Pegram has alleged in litigation filed against Comptronix that these two actions in 1989 by Comptronix with respect to his employment were unjustified and were wrongly investigated by William Hebding so that Hebding could implement and perpetuate an illegal and fraudulent accounting scheme to overstate the earnings of the Company for Hebding's personal financial benefit.
 "6A. In November 1992, the Board of Directors of Comptronix formed a Special Committee to investigate fraudulent accounting, financial, and reporting practices, devised and executed by three members of Comptronix management — William Hebding [and two others]. These individuals were subsequently discharged for cause by Comptronix.
 "6. Harvey Pegram has recently established a new company providing printed circuit board assembly, cable and wire harness assembly and other services as an outsource contractor. Comptronix Corporation makes use of many of the services of the sort provided by Mr. Pegram's company in its business and in April 1994, Comptronix Corporation determined to begin making use of Mr. Pegram's company as a supplier based upon satisfactory agreements between Comptronix and Mr. Pegram's company as to competitive pricing, quality and delivery. In addition, Mr. Pegram and Comptronix have agreed that the lawsuit filed by Mr. Pegram against Comptronix will be dismissed.
 "7. The current management of Comptronix and Mr. Pegram are pleased to be able to have resolved their prior difficulties and look forward to renewing their association with each other."
Hebding attempted to have the trial of the claims against him stayed until all statutory limitations periods had run pertaining to any crimes he might have committed in connection with his activities at Comptronix. The trial court granted a stay; however, this Court later issued a writ of mandamus directing the trial to set aside the stay and allow the case to proceed to trial. See Ex parte Pegram, 646 So.2d 644 (Ala. 1994). After Pegram had presented his case-in-chief, *Page 701 
chief, the trial court directed a verdict for Hebding.
Pegram contends that the directed verdict was improper. He argues that he presented sufficient evidence to require the presentation of his claims to a jury. With respect to the claim alleging intentional interference with Pegram's employment contract, Hebding contends that Pegram's transfer from his position as vice president of material management and procurement to his position as vice president of sales and marketing did not violate his employment contract (i.e., that the two positions were "comparable," within the meaning of Pegram's employment contract) and, thus, that it could not have formed the basis for a finding that he had interfered with Pegram's contract. Hebding also contends that the undisputed evidence showed that he played no direct or improper role in forcing Pegram out of the company. According to Hebding, Pegram was discharged after an internal investigation initiated by persons within the company other than Hebding (a special committee) had revealed that Pegram was guilty of illegal insider stock trading. With respect to Pegram's fraud claims, Hebding argues that Pegram's suppression claim (based on allegations that Hebding had failed to disclose to the board his involvement in the fraudulent accounting scheme) was, in effect, a claim on behalf of the company that could not support an award of damages to Pegram personally, and that his misrepresentation claim (based on Pegram's testimony that Hebding had promised to allow Pegram to always remain in charge of material management and procurement) was based on a promise of future performance, with respect to which there was evidence only of a breach (i.e., no evidence of an intent, at the time the promise was made, not to perform.)[1] Hebding also argues that the misrepresentation claim was barred by the applicable statute of limitations.
The elements of a cause of action for intentional interference with contractual or business relations are as follows: 1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; and 4) damage to the plaintiff as a result of the defendant's interference. Justification for the interference is an affirmative defense that has to be pleaded and proved by the defendant. Century 21 Academy Realty,Inc. v. Breland, 571 So.2d 296 (Ala. 1990). A corporate officer or employee, such as Hebding, may individually commit the tort of intentional interference with business or contractual relations to which the corporation or employer is a party. However, this Court has held that an action cannot be maintained against such an officer or employee of a corporation unless that person was acting outside the scope of employment and with actual malice at the time of the interference. Hickmanv. Winston County Hospital Board, 508 So.2d 237 (Ala. 1987).
After carefully reviewing the record, we conclude that the trial court erred in not submitting to the jury Pegram's claim alleging intentional interference with his employment contract. A directed verdict is proper only if the evidence and the inferences that can be drawn from that evidence must lead reasonable persons to only one conclusion. Baker v. Bennett,603 So.2d 928 (Ala. 1992), cert. denied, 507 U.S. 912,113 S.Ct. 1260, 122 L.Ed.2d 658 (1993). There appears to be no dispute that Pegram had an employment contract with Comptronix; that Hebding was fully aware of that contract; and that Pegram suffered damage as a result of his discharge. The basic disagreement between the parties concerns whether there was sufficient evidence that Hebding acted outside the scope of his employment, with malice, and intentionally interfered with Pegram's employment; if Pegram presented such evidence, then the claim should have been presented to the jury. The record, viewed most favorably toward Pegram, suggests *Page 702 
that there was such evidence. The evidence indicates that Hebding played a direct role in transferring and later discharging Pegram for reasons other than those that would normally be considered in the company's best interests. A reasonable person could conclude from the evidence 1) that Pegram, one of the three principals who founded Comptronix, was a valuable asset to the company in his position as vice-president of material management and procurement; 2) that Hebding played a direct role in inexplicably transferring Pegram to a position that had less responsibility than the one he originally held and for which he had far less experience, and that the transfer was, in effect, a demotion and in violation of Pegram's employment contract with Comptronix; 3) that Hebding played a direct role in the company's internal investigation into Pegram's stock sale — a sale that had been approved by the company's general counsel; 4) that the board transferred, and later discharged, Pegram based on information provided, at least in part, by Hebding — the same person who previously had taken the position that the information with respect to Conners was not material information as far as the stock offering was concerned; and 5) that Hebding had a strong motive for wanting Pegram discharged, or at least transferred from his position as vice president of material management and procurement — to prevent Pegram from detecting Hebding's fraudulent accounting scheme. Although we appreciate the trial court's concern, as reflected in the record, that the jury could not return a verdict without speculating as to Hebding's actions with respect to Pegram, and although we recognize that this is a close case, we nonetheless conclude that there was sufficient evidence to create a question of fact as to whether Hebding acted outside the scope of his employment and with malice in discharging Pegram. We hold, therefore, that the directed verdict on the claim alleging intentional interference with business or contractual relations was improper.
With respect to his suppression claim, Pegram primarily argues that Hebding had a duty to disclose to Pegram, as a member of Comptronix's board of directors, that Hebding had engaged in an illegal accounting scheme to defraud the company and that Hebding failed to make that disclosure. The directed verdict on this aspect of Pegram's suppression claim was proper. Pegram's suppression claim was a personal claim for damages. It is well settled that when individual damages sought to be recovered by a plaintiff are incidental to his or her status as a stockholder in a corporation, the claim is a derivative one and must be brought on behalf of the corporation. McLaughlin v. Pannell Kerr Forster, 589 So.2d 143
(Ala. 1991). Although Hebding's involvement in the scheme to manipulate Comptronix's accounting records was relevant with respect to Pegram's claim alleging intentional interference with his employment contract, whatever damage Pegram may have incurred personally from Hebding's fraudulent suppression of this information from Comptronix was incidental to his status as a stockholder. Whatever recovery might be effected by a derivative action against Hebding would inure to the benefit of all innocent Comptronix stockholders and not to Pegram individually.
Pegram also argues, in connection with his suppression claim, that Hebding failed to disclose to Comptronix's board of directors that Hebding had been told by a representative of Conners that the business relationship between Conners and Comptronix in the latter part of 1989 was still "in good shape." Pegram maintains that this was information the board needed in deciding whether he had traded Comptronix stock based on inside information. The record indicates that Hebding visited with a representative of Conners in the latter part of 1989 and that Hebding later told Comptronix's general counsel that a representative of Conners had told him that the relationship between the two companies was still "in good shape." However, although Hebding's failure to disclose this information to the board was relevant with respect to the intentional interference claim, we fail to see how Hebding's suppression of information with respect to the board could provide the basis for a fraud action by Pegram. It is well settled that " 'the representee who relied on the defendant's misstatement and the plaintiff who was injured must be one and the *Page 703 
same.' " Henson v. Celtic Life Ins. Co., 621 So.2d 1268, 1272
(Ala. 1993), quoting Ames v. Pardue, 389 So.2d 927, 931 (Ala. 1980). The same rationale applies to cases involving allegations of suppression — the fraud (whether perpetrated by a misrepresentation or by the suppression of material information) must be directed toward the plaintiff in the sense that the plaintiff was intended to act upon it. Henson, at 1272. In the present case, according to Pegram, it was the board, not Pegram, that Hebding intended to influence by his silence. The directed verdict was proper with respect to this aspect of Pegram's suppression claim.
Pegram's final contention is that the directed verdict on his misrepresentation claim was improper. Although Pegram states in his brief that Hebding misrepresented to him when the company was formed in 1983 1) that the three principal founders would manage the company as "equals"; 2) that Pegram would always remain in charge of material management and procurement; and 3) that the three founders would receive equal salaries, Pegram's argument focuses on his assertion that Hebding promised him that he would never be transferred out of his area of expertise. Pegram argues:
 "[F]rom 1983 until the summer of 1989, Pegram was in charge of material management and procurement at Comptronix. However, as Pegram testified, Hebding began trying to force Pegram out of his responsibility for material management and procurement in the summer of 1989, shortly after Comptronix's initial public offering. It was only then that Pegram realized that Hebding had fraudulently misrepresented that Pegram would remain in charge of material management and procurement at Comptronix.
 "The initial public offering is significant because prior to the sale of Comptronix stock to the public, Hebding would not benefit from his fraudulent and illegal accounting scheme because no money went directly into his pocket. However, once Comptronix went public, Hebding would benefit enormously by his fraudulent and illegal scheme because the scheme would cause the price of Comptronix stock to rise and Hebding's stock [to] increase in value by millions of dollars. The fact that Hebding began trying to transfer or fire Pegram shortly after the company went public, and the fact that Hebding implemented his fraudulent and illegal scheme as soon as he had Pegram out of his position in charge of material management and procurement, are facts which a jury could use to draw reasonable inferences that Hebding never intended to keep his promise to Pegram that Pegram would remain in charge of material management and procurement.
 "Therefore, for example, the jury could reasonably find that Hebding used Pegram to start the company, but then found Pegram's honesty and integrity to be a hindrance to Hebding's fraudulent and illegal accounting scheme. A jury could reasonably infer that Hebding made the promise to Pegram intending to break it as soon as Comptronix completed its initial public offering."
After reviewing the record, and assuming that this claim is properly before us, see n. 1, we cannot agree that the jury could have reasonably found from the evidence that Hebding had no intention in 1983, when the company was formed, of allowing Pegram to remain in charge of material management and procurement. By Pegram's own admission, Hebding did not initiate his transfer and discharge until 1989, over five years after the promise was allegedly made. The record further suggests that the primary concern of the three founders in 1983 was getting Comptronix "off the ground," not making a public offering of its stock. It is, of course, familiar law that there must be sufficient evidence of an intent to deceive at the time the promise of future performance was made in order to submit to the jury a claim alleging promissory fraud. Failure to perform, alone, is not evidence of an intent not to perform at the time the promise was made. If it were, a breach of contract would be tantamount to fraud. Watters v. LawrenceCounty, 551 So.2d 1011 (Ala. 1989). Although the evidence does indicate, as Pegram argues, that Hebding, sometime around the time of the public stock offering, formed the *Page 704 
intent to transfer or discharge him, it would stretch the concept of the reasonable inference beyond the breaking point for one to conclude that Hebding entered into this business venture in 1983 with an elaborate plan to someday humiliate Pegram and defraud Comptronix. The directed verdict with respect to the misrepresentation claim was, therefore, proper.[2]
For the foregoing reasons, the judgment, insofar as it pertains to the fraud claims, is affirmed; however, insofar as it pertains to the claim alleging intentional interference with Pegram's employment contract, the judgment is reversed; and the case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, KENNEDY, INGRAM, COOK, and BUTTS, JJ., concur.
SHORES, J., concurs in that portion of the judgment reversing in part, and dissents from that portion affirming in part.
[1] Pegram did not specifically allege in his complaint that Hebding had promised to always allow him to remain in charge of material management and procurement, and it is not clear from the record and the briefs whether the complaint should be deemed amended so as to conform to the evidence. See Rule 15(b), Ala.R.Civ.P. However, in light of our holding with respect to Pegram's misrepresentation claim, we will treat that claim as being based on such a promise.
[2] Because there was insufficient evidence to submit the misrepresentation claim to the jury, we pretermit any discussion of Hebding's contention that the misrepresentation claim was barred by the applicable statute of limitations.