THOMAS, Judge.
Jeanette R. (Wicks) Jackson appeals from a judgment of the Colbert Circuit Court entered on a jury verdict in favor of Jeffery R. Wicks on his conversion claim. Wicks cross-appeals from a judgment of the trial court dismissing his shareholder-derivative claim against Jackson on behalf of The Cash Store, Inc. (“The Cash Store”). We reverse the judgment in favor of Wicks on his conversion claim, and we reverse the judgment dismissing Wicks’s shareholder-derivative claim and remand the cause with instructions to conduct a new trial regarding that claim.

Procedural History

On December 26, 2007, Wicks filed a complaint listing Jackson and Foster & Foster, C.P.A., as defendants and alleging claims of fraud, negligence, conversion, conspiracy to defraud, breach of fiduciary duty, and the tort of outrage. Jackson answered the complaint, generally denying the allegations. Foster & Foster, C.P.A., filed a motion to dismiss the complaint. On July 24, 2008, Wicks filed an amended complaint asserting, in addition to the claims asserted in the original complaint, a shareholder-derivative claim on behalf of The Cash Store. The amended complaint was not verified. Foster & Foster, C.P.A., and Jackson answered the amended complaint. Subsequently, Wicks filed a motion to dismiss Foster and Foster, C.P.A., from the action pursuant to Rule 41(a), Ala. R. Civ. P., which the trial court granted on March 12, 2009. Thus, the only remaining defendant was Jackson.
On November 7-10, 2011, the trial court conducted a jury trial in which the jury was presented testimony and documentary evidence. On November 10, 2011, Jackson filed a motion to dismiss Wicks’s shareholder-derivative claim pursuant to Rule 41(b), Ala. R. Civ. P., based on his failure to verify the amended complaint containing the claim as mandated in Rule 23.1, Ala. R. Civ. P.; she also filed a motion for a judgment as a matter of law on Wicks’s claims. On November 10, 2011, the trial court heard arguments of counsel regarding Jackson’s motion to dismiss the shareholder-derivative claim and Jackson’s motion for a judgment as a matter of law; the trial court granted her motion to dismiss the shareholder-derivative claim over Wicks’s objections.[1] Additionally, the record indicates that the trial court charged the jury regarding only the conversion claim; thus, the record supports the conclusion that the trial court granted Jackson’s motion for a judgment as a matter of law as to all claims except the conversion claim, which it presented to the jury, and the shareholder-derivative claim, which it dismissed.
*816 On November 10, 2011, the jury returned a verdict against Jackson on the conversion claim, awarding Wicks $192,000 in compensatory damages and $20,000 in punitive damages. The trial court entered a judgment on the jury verdict that same day. Jackson filed a motion to alter, amend, or vacate the judgment, which was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. Jackson filed a timely notice of appeal to our supreme court. Wicks timely cross-appealed regarding the dismissal of his shareholder-derivative claim. Our supreme court transferred the appeals to this court pursuant to Ala.Code 1975, § 12-2-7(6).

Factual Histm"y

The jury heard three days of testimony from the parties and other witnesses, including several expert witnesses. The testimony revealed the following. Judy Bullion testified that she had owned The Cash Store with Jackson from April 27, 2005, until she sold her 500 shares, or 50% interest, in The Cash Store to Wicks for $40,000 on January 20, 2006. She testified that The Cash Store was a check-cashing and title-loan business. She further testified that The Cash Store was making money while she was a shareholder and that most loans were paid off in cash and that the amount paid had to be entered into the computer system to be properly accounted for in the check-cashing and title-loan business. Bullion testified that she had owned several other check-cashing and title-loan stores besides The Cash Store and that, in her experience, it was customary that 10%-15% of the loans are written off as uncollectible bad debt and that, due to a downturn in the economy, the bad-debt number had increased by about 5%; thus, she opined that at the time of trial about 15%-20% of loans made in a check-cashing and title-loan business are not collected and are written off as bad debt. She further testified that she had had concerns about how the money was being spent at The Cash Store when she was a shareholder but that she had not raised those concerns to Jackson because, she said, she was trying to avoid any possible trouble. However, she later testified that she had filed a lawsuit against The Cash Store and that that action had been settled.
Shelby Dodd, an accountant, testified that she works at Tax Mart and that she had prepared the corporate tax returns for The Cash Store for 2007, 2008, 2009, and 2010. She testified that she had not prepared a corporate tax return for any corporate entity until Jackson requested that she prepare the first corporate tax return for The Cash Store but that she had prepared numerous individual tax returns over the years that she had been an accountant. She testified that The Cash Store is a Subchapter S corporation, which means that each shareholder should be prepared a Schedule K-l document (“K-l document”) based upon their shares of the Subchapter S corporation because, due to the tax status of a Subchapter S corporation, each shareholder must declare their portion of the corporate income as their personal income on their individual income-tax return. Dodd testified that she had prepared The Cash Store’s tax returns based on numbers that Jackson had provided to her and that she had not seen any documents to verify the numbers she had been presented by Jackson. She further testified that, for the years that she had prepared The Cash Store’s tax returns, Jackson had instructed her to issue only one K-l document to Jackson, indicating that Jackson owned 100% of the shares of The Cash Store, and that she had issued one K-l document because, she said, Tax Mart “usually do[es] what the client says.” Additionally, Dodd’s testimony revealed the following: that the 2007 corporate tax return for The Cash Store listed $89,789 as the business’s gross receipts, or total income, but that after deductions the ordi *817 nary business income or profits of The Cash Store was $28,992; that the 2008 corporate tax return listed $83,277 as the gross receipts, or total income, but that after deductions the ordinary business income or profits of The Cash Store was $23,678; that the 2009 corporate tax return listed $68,444 as the gross receipts, or total income, but that after deductions the ordinary business income or profits of The Cash Store was $226; that the 2010 corporate tax return listed $72,500 as the gross receipts, or total income, but that after deductions the ordinary business income or profits of The Cash Store was $732. She further testified that Wicks was never issued a K-l document for the years 2007 through 2010 for which Tax Mart had prepared the corporate tax returns for The Cash Store.
Tim Leigh, a certified public accountant, testified that he had been an accountant since 1973 and that he works at Leigh, King, and Associates in Sheffield. He testified that, in a separate action, the trial court had requested that he review The Cash Store’s financial records for 2006 to estimate the value of the business. He testified that, after looking at all the financial records from 2006, he had determined that the bad debt for 2006 was overstated in the amount of $66,993. He testified that overstating the bad debt of the corporation had resulted in understated profits. He testified that The Cash Store’s bad debts that were claimed in 2006 were well above the 25% mark that he figured would be correct. He also stated that the amount of bad debt claimed, as well as the existence of personal loans to both Jackson and Wicks, had raised red flags in his mind while reviewing the financial documents.
Mike Tucker, a certified public accountant, testified that he works for Boreland and Benefield and that he prepares corporate tax returns. He testified that he had reviewed The Cash Store’s corporate tax returns from 2006 through 2010 and its internal financial documents prepared by its computer software for 2006 through 2010. He opined that, based on his review of the financial documents, The Cash Store had understated its profits because it had overstated its bad debts and its expenses. He testified that gross receipts on a corporate tax return should be all receipts for the company, without taking any deductions. He explained that the 2009 corporate tax return showed total income as $68,444 but that the internal financial documents for 2009 indicated that the total check-cashing-loan interest was $108,576.79 and that the total title-loan interest was $91,375.46, for a total of $199,952.25 in interest income. He testified that the $199,952.25 figure should have appeared on line 1 of the corporate tax return as opposed to the $68,444 figure that Jackson had used because, he opined, the lower figure already accounted for deductions such as write-offs in the amount of $1,400 and miscellaneous receipts in the amount of $93,803.86 for the title-loan business and write-offs in the amount of $55,108 and miscellaneous receipts in the amount of $18,772.86 for the check-cashing business. He opined that it was improper to take any deductions from the gross-income ' line on the corporate tax return. He further opined that doing the accounting in the manner that The Cash Store had in 2009 had resulted in underreporting the corporation’s income and that The Cash Store had consistently underreported its income for the years 2006 through 2010. He compiled a document, Plaintiffs exhibit 27, which was entered into evidence, that demonstrated the difference between what was reported as gross income on the corporate tax returns and what was reported as the interest income on the corporation’s internal financial summary sheets. Plaintiff’s exhibit 27 indicated that the corporation had underreported its income by *818 $12,881.36 in 2006, by $150,037.46 in 2007, by $154,984.84 in 2008, and by $131,508.25 in 2009.
Wicks testified that he had worked for the Sheffield Fire Department for 24 years and that he had married Jackson in 2005. He testified that the parties had separated in 2006 before his purchase of 500 shares, or a 50% interest, in The Cash Store. He testified that he had believed that the purchase of a 50% ownership interest in The Cash Store was a good investment at that time, that Foster & Foster had done the accounting for The Cash Store in 2006, and that, during that fiscal year, he had received monthly statements regarding The Cash Store. He further testified that he had not received any distributions in 2006 or any other year since he had purchased the 500 shares. He testified that Jackson and he had tried to reconcile in 2006 and that they had taken a trip to the Smoky Mountains. He testified that he was unaware that any money from The Cash Store had been used to finance that trip to the Smoky Mountains or any other marital expenses. He testified that he did not take personal loans from The Cash Store but that he had endorsed one check in the amount of $5,000 at Jackson’s request. He testified that he was not making any claim for Jackson’s salary paid by The Cash Store, that The Cash Store paid too much in rent to Jackson, or that he should have received a salary from The Cash Store but that he wants only his share of the money that The Cash Store had distributed since January 2006, based on his 50% ownership interest. Wicks testified that Jackson had purchased numerous properties since January 2006 and that he was unsure of how she had paid for those properties.
Jackson testified that she had purchased several properties since January 2006. She testified that she had not used income from The Cash Store to buy any of the properties but that she could not recall how she had purchased all the properties because, she said, she had “shifted money” and “shifted property.”
Specifically, she testified that she had purchased the following pieces of real property. Jackson testified that she had purchased property located at 100 River-view in June 2006 with her mother and that the property had been purchased for $50,000 in cash. She testified that she had purchased property located at Bluffview # 10 in December 2006 with her daughter, that the property had been purchased for $66,000, and that her daughter had paid $26,000 in cash and executed a mortgage in the amount of $40,000, which was released in September 2007, a nine-month period. She testified that she had purchased property located at Lot 1 River-mont in January 2007 by herself and that the property had been purchased for $23,000 in cash. Jackson testified that she had purchased property located at lots 97 through 100 in Wildwood Estates in June 2007 by herself and that the property had been purchased for $37,000 in cash. She testified that she had purchased property located at 4235 Waterloo Road in May 2008 by herself and that the property had been purchased for $198,000 in cash. She further testified that she had sold the property located at 4235 Waterloo Road in May 2008 for $207,000 and that she had placed that amount of money into a certificate of deposit. Jackson testified that she had purchased property located at 2211 Woodward Avenue in February 2009 by herself and that the property had been purchased for $123,000, with $81,000 of the purchase price having been financed through a note secured by a mortgage on the property. She further testified that The Cash Store is currently located at the property located at 2211 Woodward Avenue and that The Cash Store pays rent to her. She testified that she had purchased property located at 114 Stormy Drive in *819 September 2009 by herself and that the property had been purchased by trading her house on Colorado Avenue that she had purchased before 2006 with the seller of the Stormy Drive property and paying the difference between the value of the Stormy Drive property and the Colorado Avenue property. She testified that she had “paid” $252,000 in property and cash to purchase the Stormy Drive property and that there was no mortgage on that property. Jackson testified that she had purchased property located at 308 Union Avenue in Mississippi in February 2011 with her mother and that the property had been purchased for $72,000 in cash, which was all paid by her mother. Jackson testified that she had purchased property located at 708 Clark Avenue in April 2011 with her mother and that the property had been purchased for $70,000 in cash.
When questioned about where Jackson had received the money to purchase the numerous properties listed above, Jackson testified that her mother and daughter had purchased several of the properties although her name was on the deeds. She further testified that she had received $300,000 in inheritance from her father and that she had used her inheritance along with other money she had before the parties’ marriage to purchase the properties. She could not explain why her bank statements did not reflect disbursement of the funds used to purchase the properties. Jackson further testified that she was unsure of where her daughter had received the money to purchase the properties but that she had given her daughter money and that her daughter earned $100,000 per year as a bookkeeper.
Jackson testified that her living expenses in 2006 were $16,000 and that that amount had increased since that time. The documentary evidence, along with Dodd’s testimony, indicated the following: that Jackson’s income in 2007 consisted of $7,500 in salary from The Cash Store and $7,454 in interest income, that her income in 2008 consisted of $0 in salary from The Cash Store and $2,368 in interest income, that her income in 2009 consisted of $7,000 in salary from The Cash Store and $1,219 in interest income, and that her income in 2010 consisted of $14,000 in salary from The Cash Store and $1,025 in interest income. Jackson testified that her mother had given her the funds to bridge the gap between her income and her living expenses.
Jackson testified that she reported the same numbers to Dodd at Tax Mart that she had previously reported to Foster and Foster. She also testified that she had never told Dodd that she was a 100% shareholder in The Cash Store and not to issue Wicks a K-l document. She testified that she had not overstated The Cash Store’s bad debts and understated its earnings. Jackson further testified that she had not used income from The Cash Store for her personal expenses but that she had loaned the corporation funds and that she had repaid herself for those loans.
Documentary evidence indicated that Jackson had written a check from The Cash Store’s account in the amount of $4,000 dated January 23, 2006, to Jeanette Rea Wicks for “payment on loan,” that she had written a check in the amount of $10,000 dated February 9, 2006, to Jeanette Rea Wicks for “payment on loan,” that she had written check in the amount of $10,000 dated February 17, 2006, to Jeanette Rea Wicks for “payment on loan,” and that she had written check in the amount of $5,000 dated March 27, 2006, to Jeanette and Jeff Wicks for “payment on loan.” She testified that all the money represented by those checks went into her personal accounts because, she said, she had loaned The Cash Store funds to pay Bullion to settle a lawsuit against it.

*820
Discussion

A. Jackson’s Appeal

In addressing Jackson’s appeal, which challenges the jury verdict against Jackson on Wicks’s conversion claim and its award of compensatory and punitive damages, we apply the following standard of review:
“In discussing the standard of review in an appeal from a judgment based on a jury verdict where the trial court has denied a motion for a new trial, this Court has stated:
“ ‘ “Jury verdicts are presumed correct, and this presumption is strengthened by the trial court s denial of a motion for a new trial. Therefore, a judgment based on a jury verdict will not be reversed unless it is ‘plainly and palpably’ wrong.” ’
“Tanksley v. Alabama Gas Corp., 568 So.2d 731, 734 (Ala.1990) (quoting Davis v. Ulin, 545 So.2d 14, 15 (Ala.1989)).”
Petty-Fitzmaurice v. Steen, 871 So.2d 771, 773 (Ala.2003).
On appeal, Jackson contends that the trial court’s judgment on the jury’s verdict against her on the conversion claim is due to be reversed. She asserts four separate arguments targeted toward the alleged error in entering a judgment on the jury’s verdict. The arguments are as follows: (1) Wicks could not maintain a direct action against Jackson for conversion; (2) the evidence was insufficient to support a conversion claim; (3) the jury’s damages award was speculative; and (4) the claim was barred because it should have been raised in the parties’ divorce action. We will consider only her argument regarding Wicks’s inability to maintain a direct action under the facts of this case, and we pretermit discussion of the remaining arguments, because the resolution of that issue is determinative of the appeal. See Favorite Mkt. Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005) (stating that this court would pretermit discussion of further issues in light of dis-positive nature of another issue).
Jackson argues that the trial court erred in submitting Wicks’s conversion claim to the jury because, she says, Wicks lacked standing to maintain a direct action against her for her alleged conversion of The Cash Store’s funds. Instead, she contends that he could maintain only a shareholder-derivative action on behalf of The Cash Store for such alleged actions. We agree.
“ ‘It is well settled that when individual damages sought to be recovered by a plaintiff are incidental to his or her status as a stockholder in a corporation, the claim is a derivative one and must be brought on behalf of the corporation.’ Pegram v. Hebding, 667 So.2d 696, 702 (Ala.1995). ‘It is only when a stockholder alleges that certain wrongs have been committed by the corporation as a direct fraud upon him, and such wrongs do not affect other stockholders, that one can maintain a direct action in his individual name.’ Green v. Bradley Constr., Inc., 431 So.2d 1226, 1229 (Ala.1983).”
Altrust Fin. Servs., Inc. v. Adams, 76 So.3d 228, 241 (Ala.2011)
Jackson cites Altrust, supra, in support of her argument. In Altrust, our supreme court analyzed the differences between a direct action and a derivative action and several cases examining the issue of standing regarding claims, both direct and derivative in nature, against corporate entities to conclude whether the plaintiffs could maintain a direct action against the defendants. Id. at 238^5. Our supreme court held that the plaintiffs could not maintain a direct action against the defendants because
“the alleged mismanagement and wrongdoing of the Altrust officers and directors .... is not unique to the plaintiffs; rather, it is suffered equally by all *821 remaining eligible shareholders in Al-trust. Because the harm suffered by the plaintiffs also affects all other remaining eligible shareholders in Altrust, the plaintiffs do not have standing to assert a direct action.”
Altrust, 76 So.3d at 246 (citing Green v. Bradley Constr., Inc., 431 So.2d 1226 (Ala.1983)).
Although the facts of the present case are distinguishable from Altrust in that Jackson and Wicks were The Cash Store’s only shareholders and, thus, the harm suffered by Jackson’s alleged conversion of corporate funds was suffered only by Wicks and not by other shareholders, the alleged harm is of the type that must be asserted in a shareholder-derivative action as opposed to a direct action. In Green v. Bradley Construction, Inc., 431 So.2d 1226 (Ala.1983), which Altrust relied upon, our supreme court noted that the alleged fraudulent conversion of corporate assets is a shareholder-derivative action because the allegations, if proven, would require the alleged converted funds to be returned to the corporation and that type of harm impacts all shareholders of the corporation. Specifically, in Green, our supreme court stated:
“Green’s complaint alleges fraudulent conversions of corporate assets, which, if the allegations are true, would by law have to be returned to the corporation, as the assets are not solely Green’s but belong to the corporation. As noted in 19 Am.Jur.2d, Corporations § 534 (1979):
“ ‘An action brought by a stockholder to recover assets for the corporation or to prevent a dissipation of corporate assets is derivative in nature. Stockholders as such may not maintain actions to recover possession of corporate property. Thus, a stockholder may not bring an action in his own name for an alleged fraudulent transfer of corporate property to another stockholder: such a suit must be by or in behalf of the corporation.’ (Emphasis added [in Green ].)”
Id. at 1229. Like the fraudulent-transfer claim in Green, Wicks’s conversion claim alleged that Jackson had fraudulently converted corporate assets. Thus, under the holdings of our supreme court as discussed above, we conclude that Wicks lacked standing to initiate a direct action against Jackson for her alleged conversion of corporate assets and that such an allegation must be brought as a shareholder-derivative action. Therefore, we reverse the judgment entered on the jury’s verdict and remand the cause to the trial court for it to vacate that judgment.

B. Wicks’s Cross-Appeal

In his cross-appeal, Wicks contends that the trial court erred by dismissing his shareholder-derivative claim pursuant to Rule 41(b) “after four years of litigation, three days of trial, and after resting [the defense’s] case,” based on Wicks’s failure to verify the amended complaint adding that claim as required by Rule 23.1. We agree.
Wicks first argues that the trial court erred to reversal in dismissing his shareholder-derivative claim pursuant to Rule 41(b) because, he asserts, Rule 41(b) is inapplicable to dismiss a claim in a jury case. Specifically, he contends that the Committee Comments to Rule 41 unequivocally indicate that Rule 41(b) governs the involuntary dismissal of actions in only nonjury cases. That rule provides, in pertinent part: “For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant.” The Committee Comments on the 1973 Adoption of Rule 41 state, in pertinent part: “The rule is *822 substantially the same as the corresponding federal rule” and
“Rule 41(b), [Fed.] R. [Civ.] P., as originally promulgated, applied to both jury and non-jury cases. By amendment, its function is clearly limited to non-jury cases. In a jury case, Rule 50 applies and the court is limited to a question of law (thereby preserving jury trial right) as to the sufficiency of plaintiffs prima facie case.”
Although we find no Alabama authority other than the Committee Comments to Rule 41 concerning the precise issue presented here — whether a trial court can involuntarily dismiss a party’s claim for failure to follow a rule of civil procedure in a jury case — we have found several federal authorities that support the conclusion that Rule 50, Ala. R. Civ. P., as opposed to Rule 41 applies in a jury case. It is well settled that federal cases construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure, which were patterned after the Federal Rules of Civil Procedure. Borders v. City of Huntsville, 875 So.2d 1168, 1176 n. 2 (Ala.2003). Thus, we turn to the federal cases for guidance.
In O’Brien v. Westinghouse Electric Corp., 293 F.2d 1 (3d Cir.1961), the United States Court of Appeals for the Third Circuit analyzed the precise issue whether a motion to dismiss a count under Rule 41(b), Fed.R.Civ.P., could be granted in a jury case. In concluding that Rule 50 as opposed to Rule 41(b) was the appropriate rule under which to “dismiss” a count in a jury case, the court stated:
“It is clear a motion under Rule 41(b) for dismissal at the end of plaintiffs case, that upon the facts and the law the plaintiff has shown no right to relief, is proper in a case without a jury. Upon granting such a motion the court should make findings of fact and conclusions of law pursuant to Rule 52(a). Upon review the findings must be accepted unless clearly erroneous. It is equally clear that in a jury case the question only can be one of law. Therefore the motion should be for a directed verdict as mentioned in Rule 50. Sano v. Pennsylvania Railroad Company, 3 Cir., 1960, 282 F.2d 936; Kingston v. McGrath, 9 Cir., 1956, 232 F.2d 495, 54 A.L.R.2d 267. If the court grants it no findings of fact are necessary and upon review the evidence must be viewed in the light most favorable to the party against whom the motion is made. Hence in this case it is held that no findings of fact were necessary, any indication in Makowsky v. Povlick, [262 F.2d 13 (3d Cir.1959) ], to the contrary notwithstanding.
“We will therefore treat the motion under Rule 41(b) in this case as one for a directed verdict, and will disregard the findings of fact of the trial court, reviewing the entire evidence in the light most favorable to the plaintiff and giving him the benefit of all reasonable inferences which may be deduced from the evidence in his favor, Warlich v. Miller, 3 Cir., 1944, 141 F.2d 168, a rule applying as well in patent cases. To adopt any other view in a jury case is to risk the deprivation of a plaintiffs right to trial by jury under the Seventh Amendment. Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 [ (1943) ].”
293 F.2d at 9-10 (footnotes omitted).
Accordingly, we will consider the trial court’s order granting Jackson’s motion for involuntary dismissal of the shareholder-derivative claim pursuant to Rule 41(b) as an order granting a motion for a judgment as a matter of law under Rule 50, Ala. R. Civ. P. Rule 50(a) states:
“(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary *823 basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
“(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.”
We review the trial court’s grant of a Rule 50 motion under the following standard of review:
“Initially, we note that a motion for a directed verdict is a procedural device by which one party tests- the sufficiency of the other party’s evidence. See, Rule 50(a),[2] Ala. R. Civ. P.; Alabama Power Co. v. Williams, 570 So.2d 589 (Ala.1990); John R. Cowley & Bros., Inc. v. Brown, 569 So.2d 375, 376 (Ala.1990); J. Hoffman & S. Guin, Alabama Civil Procedure § 8.37 (1990). Similarly, a motion for JNOV[3] simply ‘permits the trial court to revisit its earlier ruling denying the motion for directed verdict.’ Alabama Power Co. v. Williams, 570 So.2d 589, 591 (Ala.1990). The ultimate question, of course, as to either motion, is whether the nonmovant has presented sufficient evidence to allow submission of the case or issue to the jury for a factual resolution. Hoffman & Guin, supra, at § 8.37. For actions filed after June 11, 1987, the standard of review applicable to both motions is the ‘substantial evidence rule.’ See, § 12-21-12(a), Ala.Code 1975; Koch v. State Farm Fire & Cas. Co., 565 So.2d 226, 228 (Ala.1990). Thus a nonmovant must present ‘substantial evidence’[4] supporting each element of his cause of action or defense to withstand a motion for directed verdict or JNOV. This calls for ‘a purely objective determination of whether the party having the burden of proof has produced [sufficient] evidence [of a factual dispute] requiring resolution by the jury.’ Ex parte Oliver, 532 So.2d 627, 628 (Ala.1988); and see, John R. Cowley & Bros., Inc., supra.
“Additionally, in reviewing a motion for directed verdict or JNOV, this Court must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable eviden-tiary inferences as the jury would have been free to draw. Williams v. Allstate Ins. Co., 591 So.2d 38 (Ala.1991).
Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1191-92 (Ala.1997).
We must détermine whether Wicks presented substantial evidence to support his shareholder-derivative claim on behalf of The Cash Store against Jackson for mismanagement of corporate funds. As noted above, the testimony along with documentary evidence indicated that Jackson wrote checks totaling $29,000 from The Cash Store to herself or to herself and Wicks and that she had used the cash received from the deposit of those checks for her personal use. Additionally, *824 the expert testimony and documentary evidence also revealed that The Cash Store had overstated its bad debts and, thus, had understated its profits. Jackson testified that she had used The Cash Store’s funds for personal use for the parties’ trip to the Smoky Mountains and to cover expenses during the parties’ marriage; Wicks testified that he had been unaware that the parties had used funds from The Cash Store to pay for the parties’ vacation. Accordingly, reviewing the evidence in a light most favorable to Wicks, we conclude that Wicks presented substantial evidence indicating that Jackson had mismanaged the corporate funds. Therefore, the trial court improperly granted Jackson’s motion for a judgment as a matter of law on the shareholder-derivative claim.[2] We reverse the trial court’s judgment as a matter of law on Wicks’s shareholder-derivative claim, and we remand the cause with instructions to conduct a new trial regarding Wicks’s shareholder-derivative claim.
' APPEAL — REVERSED AND REMANDED.
CROSS-APPEAL — REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ„ concur.
MOORE, J., concurs in the result, without writing.

. A transcript of the motion hearing is not contained in the record on appeal. However, Wicks filed a motion to supplement the record pursuant to Rule 10(d), Ala. R.App. P., which the trial court granted, and, as a result, the trial court’s order dismissing the shareholder-derivative claim is contained in the record on appeal.

" 2 We note that Rule 50(a) has renamed this motion as a 'motion for judgment as a matter of law.’ See Committee Comments to October 1, 1995, Amendment to Rule 50.

" 3 The 1995 amendment to Rule 50, Ala. R. Civ. P., renames the JNOV motion as a 'renewal of the motion for a judgment as a matter of law.' See note 2.

" 4 'Substantial evidence’ has been defined as ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12.”

. We also note that, because the case had been tried in its entirety without objection regarding the shareholder-derivative claim, and because we have concluded that the evidence adduced did not support a judgment as a matter of law in favor of Jackson on the shareholder-derivative claim, the trial court could not have dismissed the claim merely because the complaint was not verified. See McDuffie v. Hooper, 294 Ala. 293, 296, 315 So.2d 573, 576 (1975) (finding that the issue whether the parties had been engaged in a joint venture was tried by the implied consent of the parties because McDuffie "made no objection at any time during the course of the trial”); see also Rule 15(b), Ala. R. Civ. P. ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.”).